## TEXAS & P. RY. CO. v. STATE et al. *
### No. 7690.

Court of Civil Appeals of Texas. Austin.
May 4, 1932.

On Rehearing June 1, 1932.

W. A. Keeling, of Austin, and T. D. Gresham and M. E. Clinton, both of Dallas, for appellant.

James V. Allred, Atty. Gen., and Geo. T. Wilson and R. W. Yarborough, Assts. Atty. Gen., for appellees.

BAUGH, J.

Two questions presented in this case are, first, whether the Texas & Pacific Railway Company owns in fee the title to its right of way across Ector county, Tex.; and, second, if it owns only an easement over said lands, whether under article 6317, R. S. 1925, it may extract the oil from underneath said right of way and use same in the operation of its trains. The litigation resulted from the discovery of oil in that county, and the issues here presented are based upon the action of the trial court in sustaining special exceptions of the state to the railway company's pleadings, and in excluding certain evidence offered by the railway company.

The first contention made by appellant is that the resolution of the Legislature of Texas, approved February 9, 1850 (Acts 3d Leg. c. 124), granted and conveyed to the United States in præsenti a railroad right of way in fee over the public lands of the state of Texas, to be subsequently located; and that the United States Congress, in chartering the Texas Pacific Railroad Company in 1871, vested such right of way in said federal corporation.

Appellant has very ably presented the historical background for its contention. It appears that the matter of a transcontinental rail route to the Pacific Coast had become a national demand in 1849, accentuated no doubt by the discovery of gold in California. In that year the President in his message

to Congress urged that a survey of proposed routes be made with a view to granting federal aid, or, if advisable, to a construction of such road by the federal government itself. In December, 1849, the Governor of Texas, in his message to the Legislature, urged co-operation by the state of Texas in such enterprise, and the designation of a southern route through Texas. In consequence the resolution of February 9, 1850 (Acts 3d Leg. c. 124), was passed, the pertinent portions of which read as follows:

"Joint Resolution Authorizing the Government of the United States to Construct a National Railroad Through the Limits of the State of Texas, to The Pacific Ocean:

"Section 1. Be it resolved by the Legislature of the State of Texas: That the State of Texas hereby grants and guarantees to the United States the right of way through this State, for a National Railroad, to be located and constructed under the authority of an act of Congress, from the Gulf of Mexico or Mississippi River, to the Pacific Ocean, and hereby authorizes the officers, agents and contractors, acting under an act of Congress for that purpose, to locate, construct, use and control the said railroad; and such railroad may commence at such point in this State on the coast of the Gulf of Mexico, or may enter this State at such point on the eastern or northeastern boundary line of the State, and leave the same at such point on its western boundary as may be determined on by or under an act of Congress. * * *

"Sec. 2. Be it further resolved, that the State of Texas, agrees to extend to the United States all reasonable and proper facilities and co-operation in the construction of said road, and hereby declares that all public lands within one hundred yards of the center of the road, shall belong to and vest in the United States; and all locations, surveys and patents, made on the same, after the road has been definitely laid out, shall be void.

"Sec. 3. Be it further resolved, That should the line of said road commence at any point in this State on the coast of the Gulf of Mexico, or enter this State at any point on the eastern or northeastern boundary south of the thirty-fourth degree of latitude, and leave this State on its western boundary at the town of El Paso on the Rio Grande, or at some point on the said river not farther north than one hundred miles distant from the said town, the State of Texas in addition to the right of way and the grant of lands heretofore guaranteed and declared, doth hereby agree, that all public lands lying within ten miles from the line of one hundred yards from the center of the railroad above granted, shall be divided into sections of six hundred and forty acres each, or some less size when from the nature of the ground such may be more convenient; and that every alternate section shall belong unto and vest in the United States, the said alternate sections to be appropriated to the construction of and for the use and benefit of said road; * * * provided, the expense of laying off the sections and alternate sections, shall be incurred by the United States; and provided further, that if the government of the United States shall not have adopted this route for the construction of the road, by the fourth day of March, 1851, then, and in that case, this resolution shall cease, and have no force or effect.

"Sec. 4. Be it further resolved, That each alternate section is hereby reserved to the State, and shall not be subject to location; but shall be held and reserved to the use of the State, and subject to future disposition by the Legislature.

"Sec. 5. Be it further resolved, That in granting the provisions in this act, they are granted upon the express condition, that the State of Texas reserves the right to construct or authorize to be constructed, any other railroad within her limits which she may deem proper, which may connect with the main track of the railroad to be constructed by the United States, or by its authority."

Surveys were made by the federal government on this route in 1850, 1851, and 1852. In 1853 Congress directed the Secretary of War to make further surveys on several proposed routes, one of which was along the thirty-second parallel of north latitude, and in February, 1855, Jefferson Davis, Secretary of War, reported to Congress that the route along the thirty-second parallel was the most practical and economic route. In 1853 the Gadsden Purchase from Mexico was effected, primarily to afford an extension of such proposed route along the thirty-second parallel to the Pacific Coast. The intervention of the Civil War, however, deterred further action on this matter. On February 14, 1871, the Texas Legislature renewed its efforts and adopted another resolution (Acts 12th Leg., Joint Resolutions, c. 6) providing inter alia: "Be it resolved by the Legislature of the State of Texas, That the Congress of the United States is earnestly requested to pass a bill for the construction of a railroad from the eastern boundary of Texas to the Pacific Ocean, on or near the thirty-second parallel of latitude, as soon as possible, and to grant the same aid for the construction of this railroad that has been granted to secure the building of the Northern Pacific Railroad."

By act of Congress, approved March 3, 1871 (16 Stat. 573), the Texas Pacific Railroad Company was incorporated; section 8

of said act (page 576), providing: "That the right of way through the public lands be, and the same is hereby, granted to the said company · for the construction of the said railroad and telegraph line. * * * Said right of way is granted to said company to the extent of two hundred feet in width on each side of said railroad where it may pass over the public lands. * * *"

Appellant's railroad was constructed in 1881, at which time the lands in Ector county were wild public lands of the state. When Texas entered the Union, it reserved to itself all of its public domain over which the federal government had no control and no power to make grants. Appellant contends, however, that by the resolution of February 9, 1850, the state made an unqualified grant out of its public domain to the federal government of right of way lands for a railroad, to be thereafter constructed by the federal government or under its authority; that this right of way land was in turn granted to appellant in the act of Congress incorporating it; and that, when the road was located and built in 1881, its title became effective as of date of the original grant, i. e., February 9, 1850; that is, that the proviso at the end of section 3 relates to, and applies only to, said section 3; and does not relate to nor limit the grant made in section 1 of the resolution. Cases to sustain this contention are cited which arose from the construction of the Northern Pacific Railroad and other federal land grant railways, wherein similar grants of federally owned public lands were made. If the resolution of February 9, 1850, made an express grant in fee in præsenti of Texas public land to the federal government, appellant is correct.

■ But we do not so construe this resolution. We think the resolution must be construed as a whole, and no section can be construed apart from its single general purpose —to secure the construction of a railroad across the state to the Pacific. The caption of the act so indicates. Section 1 relates to a right of way; section 2 to the co-operation of the state in the construction of such railroad; and section 3 to the donation of 10 sections per mile for the construction of the road. When considered as a single act or resolution indivisible as to sections, as we think it must be, the purport of it in its entirety merely constituted a tender or offer by the state to the federal government to make certain grants and do certain things on condition that the federal government accept it according to its terms, the prime condition being that the federal government adopt the "route for the construction of the road by the fourth day of March, 1851," otherwise "this resolution shall cease, and have no force or effect."

■■ The term "this resolution" obviously applies to the act in its entirety. The fact that it was added by way of amendment to section 3 while the matter was under discussion before the Legislature does not limit its application to that section alone. Appellant cites in support of its contention that such proviso modifies and relates only to section 3, particularly Potter v. Robison, 102 Tex. 448, 119 S. W. 90; City of Quanah v. White, 88 Tex. 14, 28 S. W. 1065; and Campbell v. Wiggins, 85 Tex. 428, 21 S. W. 599. The Supreme Court in the Potter Case held that the natural and appropriate office of a proviso to a statute, or to a section thereof, is to restrain or qualify the provisions immediately preceding it. Such is the general rule, but it is equally true that, where the intent is clear, a proviso may relate to the act as a whole, and should be given such broader application where it is clearly the legislative intent to do so. Jester v. Lancaster (Tex. Civ. App.) 266 S. W. 1103, 1105 (writ refused); McDonald v. U. S., 279 U. S. 19, 49 S. Ct. 218, 73 L. Ed. 582; 25 R. C. L. §§ 232, 233, pp. 986, 987. We find no reasonable hypothesis for making the proviso in question apply to section 3 only. The donation of ten sections of land per mile of railroad built was clearly contingent upon and dependent upon first surveying and adopting the route of the road. Until that was done, no definite surveys could be made of such lands, and no reason obtains for limiting the time as to that alone. On the contrary, cogent reasons did obtain for limiting the time in which the route of the road should be adopted. The President and Congress then in office were favorable to the enterprise. On March 4, 1851, the session of Congress would terminate and a new presidential term begin; and it was doubtless the purpose of the Legislature by such limitation to thereby seek to induce favorable action promptly by the federal government on the offer of the state. Clearly the proviso, we think, applied to the resolution as a whole, and the federal government, not having accepted the state's offer within the prescribed time, obtained no rights of any character in and to the lands in question.

Consequently as a part of the public domain of the state the federal government could not grant any rights therein to appellant corporation when it was chartered in 1871.

■ Appellant next contends that, pursuant to section 5 of said resolution of February 9, 1850, the Legislature by Act of February 16, 1852 (Sp. Acts 4th Leg., c. 192), incorporating the Texas Western Railroad Company, whose name was changed to the Southern Pacific Railroad Company, granted to the company the right to take and hold public lands of the state as therein prescribed, in the construction of a railway to connect with such trans-

continental line. And that appellant company acquired such lands through acquisition of all properties and rights of the Southern Pacific Company. This contention is not sustained for two reasons: First, because this act of 1852 was not in any manner based upon the resolution of 1850, because that resolution, by its own terms, had become a nullity. Second, because no railroad under that act was ever constructed further west than Longview. The Southern Pacific did in 1859 survey a route as far west as eight miles north of Abilene, but this route from Fort Worth west was never adopted by appellant, and no route selected nor construction ever undertaken through such territory prior to the chartering of appellant company. The Act of May 24, 1871 (Gammel's Laws, vol. 6, p. 1623), shows that prior to that time three railroad companies had been incorporated in an effort to secure construction of a railroad from the eastern border of Texas to El Paso, none of which had done so. And on February 14, 1871, the Texas Legislature had passed another resolution asking the federal government to construct such line to the Pacific. The legislative history of the state is replete with efforts to encourage railroad construction, and discloses numerous offers, grants, and resolutions which were never accepted nor acted upon. It was not until subsequent to 1870 that any extensive construction was accomplished. Meantime the Legislature in 1861 enacted what is now article 6339, R. S. 1925, expressly providing that a right of way secured by condemnation over either public or private lands should not be construed to include the fee-simple estate. Without further discussion of the matter we think it is clear that, when appellant railroad company undertook the construction of its road over the public lands of the state in 1881, it did so subject to the laws of the state then in force relating thereto. The fact that it was chartered by the United States did not relieve it from such regulation so far as the state's public lands or police power were concerned. We conclude, therefore, that under the pleadings and the agreed statement of facts appellant does not have a fee-simple title to its right of way over the lands in question.

The issue as to whether appellant is entitled under the provisions of article 6317, R. S. 1925, to produce and use the oil beneath its right of way in the operation of its trains was decided adversely to appellant's contention by the Supreme Court in Right of Way Oil Co. v. Gladys City Oil Co., 106 Tex. 94, 157 S. W. 737, 51 L. R. A. (N. S.) 268, and we deem it unnecessary to discuss it further here.

We have not undertaken to discuss the several propositions made by appellant, all interestingly and well presented, nor the numerous authorities cited and discussed in the brief; but have confined our discussion to the issues we consider as determinative of the case.

Finding no error in the record, the judgment of the trial court is affirmed.

Affirmed.

### On Motion for Rehearing.

Appellant calls our attention to the fact that our statement in our opinion that: "On March 4, 1851, the session of Congress would terminate and a new Presidential term begin, * * *" is historically incorrect. In this appellant is correct. A new presidential term did not begin until March 4, 1853. We make this correction for the purpose of accuracy. It does not, however, affect the conclusions reached. To this extent the motion is granted. In all other respects it is overruled.

Granted in part and in part overruled.